UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
EUROSPARK INDUSTRIES, INC.,
Debtor-in-Possession,

                                    Plaintiff,              MEMORANDUM and ORDER

            -against-

THE UNDERWRITERS AT LLOYDS                          1:05-CV-0208 (ENV) (JMA)
SUBSCRIBING TO THE RISK ON COVER
NO. 97FA0071010A, AND THE UNDERWRITERS
AT LLOYDS SUBSCRIBING TO THE RISK ON
CERTIFICATE NO. FC10328697,

                                    Defendants.
-------------------------------------------------------------x

EUROSPARK INDUSTRIES, INC.,
Debtor-in-Possession,

                                    Plaintiff,

            -against-

MASSACHUSETTS BAY INSURANCE COMPANY,

                                    Defendant.
------------------------------------------------------------- x

VITALIANO, D.J.

        Plaintiff and debtor-in-possession Eurospark Industries, Inc. ("Eurospark"), a former

manufacturer of gold jewelry, has sought relief under insurance policies issued by defendants

Underwriters at Lloyds ("Lloyds") and Massachusetts Bay Insurance Company ("Mass. Bay")

for various claims of loss relating to the alleged theft of gold from its premises in March 1998.

Disclaiming coverage, Lloyds and Mass. Bay have each moved for summary judgment.

Magistrate Judge Joan M. Azrack, to whom these motions had been referred, has filed her report

recommending that Lloyds' motion be granted in part and denied in part, and Mass. Bay's

1

motion be denied. The Court accepts and concurs in Judge Azrack's recommendation.

## Facts and Procedural History

Eurospark's business was manufacturing at its Long Island City factory raw gold into finished chains and jewelry.[1] While in business, Eurospark always maintained various quantities of gold at its factory, including raw gold, finished products, and work-in-process. Most of the gold maintained there was on consignment to Eurospark by Fleet Precious Metals Inc. ("Fleet"). Eurospark was obligated to pay interest to Fleet on the consignment gold in its possession and, as it sold finished gold products to its customers, would make payments to Fleet. Gold is generally bought and sold at a set price known in the gold industry as the London Bullion Brokers 2nd fixing price, or 2nd London Fix. Eurospark's profits were derived from the charge it imposed on its customers for labor involved in manufacturing jewelry.

On March 14, 1998, an armed robbery supposedly occurred at the factory, with the loss of a quantity of gold.[2] Eurospark subsequently submitted claims under its insurance policies with Lloyds for the value of the stolen gold and with Mass. Bay for business income lost as a result of the robbery.

### I.    The Lloyds Claim

During the relevant period, Eurospark had both primary and excess "Jewellers Block" policies with Lloyds totaling $5.5 million in coverage.[3] Following the alleged theft, Eurospark filed a proof of loss statement in which it claimed that it had sustained a loss of roughly $4

---

[1] Unless otherwise noted, the facts and procedural history set forth in this decision are undisputed.

[2] Lloyds and Mass. Bay allege that the robbery was staged by Eurospark's president, Michael Spiegel, but those allegations are not before the Court for purposes of the motions.

[3] In relevant part, the excess policy is governed by the terms and conditions contained in the primary policy. Although Eurospark seeks coverage under both policies, for ease of reference, the Court refers only to the Lloyds' "policy."

million based upon (a) the value, according to the relevant 2nd London Fix price, of 10,643 fine troy ounces (FTO) of the stolen gold, and (b) $959,109 in the value of labor lost in that portion of the gold that had been manufactured or was in the process of being manufactured into chains and jewelry. At some point after the claim was filed, Eurospark retained Bourget & Associates, Inc. ("Bourget"), a forensic accountant, to prepare a so-called "roll-forward" calculation to support its claim. A roll-forward calculation is done in lieu of a perpetual inventory, that is, a calculation starting with the known inventory as of the date of the last physical count, then adding "gold in" by FTO and subtracting "gold out" up to the date of the robbery. The roll-forward inquiry in this case began January 1, 1997 (the date of a physical count which had been audited and supervised by Eurospark's accountant, BDO Seidman) and extended to March 14, 1998, the date of the robbery.

Pursuant to a cooperation clause in the policy, Lloyds also demanded that various witnesses for Eurospark appear for examination under oath (EUO). Numerous witnesses appeared and testified, including Eurospark's president and sole shareholder, Michael Spiegel. Spiegel's testimony at his EUO forms the primary basis for Lloyds' disclaiming coverage in its instant motion. In particular, Spiegel was asked about two confirmations from Fleet in April 1997 that showed payments to Fleet totaling over $1 million for 3000 FTO of gold, resulting in a reduction to Eurospark's consignment account by that amount. Spiegel initially characterized these transactions as a purchase by Eurospark and stated that the purchase was made with extra money from Eurospark's accounts receivable. When confronted at the EUO both with Eurospark's bank statements for April 1997, which did not show the $1 million coming out of Eurospark's account, and with Eurospark's gold inventory for that period, which did not show a corresponding increase in the amount of gold, Spiegel advised the examiner that all questions

3

regarding such records should be referred to his accountant, BDO Seidman. During this same line of inquiry at the EUO, Spiegel was also asked about one of Eurospark's customers, Mosexpo Moscow. Spiegel did not affirmatively state that the April 1997 transaction had anything to do with Mosexpo – though, Eurospark points out, Spiegel was not asked directly whether this transaction had any connection with Mosexpo.

After an elapse of time, in papers filed in connection with Eurospark's motion for summary judgment in the bankruptcy court (ultimately unsuccessful), and in responses to interrogatories in that proceeding, and in a Bankruptcy Rule 7030 deposition, Spiegel's description of the April 1997 transaction had changed significantly. Regardless the epiphany, Spiegel now recalled that the gold was not purchased by Eurospark, but by Mosexpo. According to Spiegel, Mosexpo placed a large order with Eurospark in early 1997 requiring 3000 ounces of gold to be manufactured into jewelry. Eurospark either did not have or did not wish to pay the $1 million necessary to acquire the gold from Fleet's consignment line, so it was agreed that Mosexpo would pay Fleet directly for the gold. Shortly after Mosexpo paid Fleet, however, Mosexpo cancelled the jewelry order with Eurospark, apparently due to a change in Russian tax laws that had made the order unprofitable for Mosexpo. However, Mosexpo still wished to take the raw gold for which it had already paid. Therefore, some weeks after the cancellation of the order, it picked up 3000 ounces of gold by messenger from Eursopark's factory. Mosexpo's order and cancellation were apparently given orally to Spiegel over the telephone, and Eurospark does not have records specifically reflecting Mosexpo's order, cancellation, or pickup of the gold.[4]

Lloyds now disclaims coverage on the grounds that Eurospark voided coverage when

---

[4] Eurospark did, however, issue contemporaneous transfer memoranda to Fleet showing that the gold was for Mosexpo and would be paid for via wire transfer from a third party.

4

Spiegel gave false testimony at his EUO regarding the April 1997 transaction, and further, that Eurospark breached its obligations under the policy by failing to keep records regarding the Mosexpo transaction; it claims that the contract language entitles it to summary judgment as a matter of law. In the alternative, Lloyds moves for partial summary judgment dismissing that part of Eurospark's claim seeking indemnification for the "labor component" of the stolen gold, which, it contends, was not covered under the policy in any circumstance.

## II.    The Mass. Bay Claim

Eurospark also filed a separate claim with Mass. Bay for roughly $1.5 million in lost business income and for covered extra expenses resulting from the theft of the gold, which, pursuant to a co-insurance provision, Eursopark reduced to just over $1 million. The Mass. Bay policy insures for the loss of business income sustained during the "period of restoration" following a loss, which was to begin on the date of a physical loss of the property and end on the date when the lost property "should be repaired, rebuilt, or replaced with reasonable speed and similar quality." Mass. Bay now disclaims on the grounds that the policy excluded coverage for the stock on Eurospark's premises and, in the alternative, that Eurospark's records as to the gold allegedly stolen were so poor as to render its claim speculative.

## III.    Procedural History

Eurospark filed for bankruptcy in August 1998, and the instant action was commenced as separate adversary proceedings against the defendants in the bankruptcy court. The adversary proceedings were consolidated and referred to Judge Edward R. Korman of this Court, who then returned the case to the bankruptcy judge with instructions to complete all pre-trial discovery and return it to Judge Korman for trial. On January 13, 2005, the case was transferred back to Judge Korman for all purposes. On January 26, 2006, Judge Korman referred the instant motions for

5

summary judgment to Magistrate Judge Azrack for a report and recommendation. On April 20, 2006, overall responsibility for the case was transferred to this Court. On February 1, 2008, Magistrate Judge Azrack issued her Report and Recommendation ("R&R"), recommending that this Court grant Lloyds' motion for summary judgment only with respect to Eurospark's claim for lost labor value and otherwise deny it, and deny Mass. Bay's motion for summary judgment altogether. Eurospark, Spiegel as intervenor, and Lloyds have each filed objections to the R&R. Mass. Bay has not filed an objection.

### Magistrate Judge's Report and Recommendation

More specifically, as to Lloyds' motion to dismiss on the grounds of fraud, although Judge Azrack notes that Lloyds has adduced evidence that would permit a reasonable person to conclude that Spiegel had lied under oath regarding the April 1997 transaction, she recommends denial of summary judgment because the motion ultimately turns on assessments of credibility, which, she notes, are generally questions for a jury to determine.

As to Lloyds' motion based on Eurospark's failure to keep books and records, Judge Azrack recommends that, drawing all inferences in favor of the nonmovant, a trier of fact could find that the absence of the April 1997 transaction from Eurospark's books and records was inconsequential to determining any loss. Accordingly, she recommends that summary judgment should be denied on this ground as well.

But, as to Lloyds' alternative claim that the "labor component" of the stolen gold was not insured, Judge Azrack determined as a matter of law that coverage for the loss of "stock" under the Lloyds policy did not include the cost of labor. It is for this reason, therefore, she recommends the grant of partial summary judgment for Lloyds.

Finally, as to Mass. Bay's motion for summary judgment, although she finds that it may

6

be difficult for a fact finder to determine from Eurospark's records precisely how much business income was lost, Judge Azrack notes that the robbery of the gold did have some impact on Eurospark and had to have been covered to some extent under the Mass. Bay policy (including a significant charge for extra interest expense as a result of a loan made necessary by the robbery). Consequently, Judge Azrack recommends the denial of Mass. Bay's motion in its entirety.

## **Standard of Review**

When a magistrate judge is assigned without consent of the parties to hear a pretrial matter dispositive of a claim or defense of a party, "the magistrate judge shall enter a recommended disposition, including, if appropriate, proposed findings of fact." Fed. R. Civ. P. 72(b)(1). In reviewing such an R&R, a district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). However, depending upon history, one of two standards apply. See Urena v. New York, 160 F.Supp.2d 606, 609-10 (S.D.N.Y. 2001). Unobjected to findings of the R&R may be adopted by the district court so long as they are not clearly erroneous. Tsabbar v. Eason, No. 04-cv-10215, 2006 WL 3755178, at *2 (S.D.N.Y. Dec. 21, 2006); Knoll v. Equinox Fitness Clubs, No. 02-cv-9120, 2006 WL 2998754, at *1 (S.D.N.Y. Oct. 20, 2006). But, findings that are timely objected to require a *de novo* determination by the district judge. Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1); United States v. Raddatz, 447 U.S. 667, 674, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). The *de novo* standard requires that the district judge make an "independent determination of a controversy that accords no deference to any prior resolution of the same controversy." Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc., 51 F. Supp. 2d 457, 466 (S.D.N.Y. 1999) (quoting Raddatz, 447 U.S. at 690 (Stewart, J., dissenting)).

Since Eurospark, Spiegel, and Lloyds have all timely objected to the R&R as to Lloyds'

7

motion, the Court must determine that motion *de novo*. But, given that no party has filed objections to the R&R recommending denial of Mass. Bay's motion, the Court will simply apply the clearly erroneous standard in considering its adoption.

## Summary Judgment Standard

Under the Federal Rules of Civil Procedure, a court must grant summary judgment upon finding, based on the pleadings, depositions, interrogatory answers, admissions, and affidavits that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004). In determining whether the moving party has met this burden, a court must construe all evidence in a light most favorable to the nonmoving party, resolving all ambiguities and inferences in its favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247-48 (emphasis in original); Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 90 (2d Cir. 2002). Material facts are those, which given the substantive law, might affect the suit's outcome. Anderson, 477 U.S. at 248.

If the moving party makes a *prima facie* showing that there are no genuine issues of material fact, the nonmoving party must go beyond the pleadings and put forth "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); Davis v. New York, 316 F.3d 93, 100

(2d Cir. 2002). In so doing, the nonmoving party may not rely on conclusory allegations or speculation. Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004) (citing D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.1998)); Fed. R. Civ. P. 56(e) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."). Thus, to defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (quoting Matsushita, 475 U.S. at 586). Nonetheless, the nonmoving party need not make a compelling showing; it need merely show that reasonable minds could differ as to the import of the proffered evidence. R.B. Ventures, Ltd. V. Shane, 112 F.3d 54, 59 (2d Cir. 1997).

### Discussion

#### 1. Lloyds' Motion Based Upon Eurospark's Allegedly Fraudulent Statements

A disclaimer provision in the Lloyds' insurance policy states that "[i]f the assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this insurance shall become void and all claim hereunder shall be forfeited." Lloyds argues that Spiegel's characterization of the April 1997 transaction at his EUO as a purchase by Eurospark with money from accounts receivable constitutes, as a matter of law, a knowingly false statement as to a material issue – which, Lloyds contends, is sufficient to vitiate coverage given this language.

As the R&R observes, insurance policies will often contain an explicit "false swearing" disclaimer (such as those in fire insurance policies that are mandated by New York Insurance

Law § 3404(e)),[5] which voids coverage if the insured knowingly swears falsely regarding any material issue. But, Judge Azrack distinguished these "false swearing" clauses from the stated clause in this policy, which refers only to the filing of a *claim* that is "false or fraudulent . . . in amount or otherwise." It was a crucial difference for Judge Azrack, who concluded that "[t]o establish its affirmative defense Lloyds must demonstrate that Eurospark made its claim for insurance coverage knowing that the *claim* was false or fraudulent; mere false swearing by itself does not nullify the coverage." R&R at 7 (emphasis in original). In any event, Judge Azrack also found that Lloyds had not carried its burden of showing as a matter of law either Spiegel's intent to defraud or the materiality of his alleged misrepresentations. All of which led to the recommendation now before this Court that summary judgment on the grounds of Eurospark's alleged fraud be denied to Lloyds.

Lloyds objects to the R&R's conclusion that only a false "claim" will suffice to void coverage, arguing that the prohibition on making a false claim "in amount *or otherwise*" (emphasis added) includes false swearing as to a material issue. Further, it is Lloyds' position that the record conclusively establishes both Spiegel's intent to defraud and the materiality of his misrepresentations. As to Spiegel's intent, Lloyds contends that it was highly unlikely that Spiegel would have failed to recall the April 1997 transaction, which involved a large purchase of gold, and that it was entirely implausible that any purchase would have been made with money from accounts receivable.[6] Lloyds also points out that Spiegel failed to correct any

---

[5] That clause reads as follows: "This entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto." N.Y. Ins. Law § 3404(e).

[6] Lloyds points out that there was not nearly enough cash in Europark's accounts at the time for Eurospark to have made such a large payment. Moreover, it argues, it would have made little sense for Eurospark to have paid down the consignment line with excess cash, given that the

statement he had made in the errata to his EUO and only changed his story in later papers filed after the adversary proceedings had been commenced. The only possible inference, Lloyds argues, is that Spiegel willfully lied at his EUO. Further, Lloyds urges that there can there be no material issue in dispute about the fact that this transaction – which reduced Eurospark's consignment balance by $1 million – was relevant to Lloyds' investigation at the time. Indeed, Lloyds notes that for purposes of verifying the roll-forward calculation, which relied on all "gold in" and "gold out" transactions between January 1997 and March 1998, a movement of 3000 FTO of gold off of Eurospark's premises was highly relevant and a quite germane subject for the examiner to inquire about.

Eurospark responds that Spiegel simply failed to recall the April 1997 transaction during his EUO and, further, that if he made any misrepresentations, they were immaterial. In his affidavit in opposition to Lloyds' motion, Spiegel ascribes his statements to a failure to recall a single transaction, among many, that occurred over a year before the EUO. It was only when he was able to focus on the transaction in later court proceedings, he avers, that he was able to recall the details of the Mosexpo purchase. Further, Spiegel points out that, throughout his EUO, he primarily responded to questions regarding this and all other individual transactions that such questions should be addressed to his accountants, BDO Seidman. At no point, Spiegel observes, did the Lloyds examiner ask him directly to connect the transaction with Mosexpo, even though from his questions, the examiner appeared to have known or suspected that Mosexpo was involved. And, more dispositively, argues Eurospark, the fact that Lloyds knew that Mosexpo was involved meant that any misinformation about the Mosexpo transaction being a purchase by Eurospark instead was immaterial to Lloyds' investigation at the time.

---

interest rate Eurospark paid on the Fleet consignment line was significantly lower than the prime rate of interest.

A salient point, however, towers over the debate about the clause. Assuming, as Lloyds argues, that a false statement by the insured on a material issue with intent to defraud *is* sufficient to vitiate coverage under the specific policy clause at issue here, Lloyds must still prove, under New York law (which it is not disputed applies here) that Spiegel intentionally made material misrepresentations at his EUO by clear and convincing evidence. See Ausch v. St. Paul Fire & Marine Ins. Co., 125 A.D.2d 43, 45, 511 N.Y.S.2d 919 (2d Dep't 1987); see also Varda, Inc. v. Ins. Co. of North America, 45 F.3d 634, 639 (2d Cir. 1995). Such a higher quantum of proof is mandated because "unintentional fraud or false swearing or the statement of any opinion mistakenly held are not grounds for vitiating a policy." Sunbright Fashions, Inc. v. Greater New York Mut. Ins. Co., 34 A.D.2d 235, 237, 310 N.Y.S.2d 760 (1st Dep't 1970). As a result, it is undeniably clear that this entire defense of disclaimable coverage turns on Spiegel's credibility in his explanation that the statements upon which Lloyds bases its argument resulted from failures of recollection and were not intended to defraud.[7]

In federal court, credibility is, of course, generally for a jury as fact-trier to determine. See Staten Island Supply Co. v. Lumbermens Mut. Cas. Co., No. 02-CV-6390, 2005 WL 711678, at *5 (E.D.N.Y. 2005). New York state courts, on the other hand, do recognize

---

[7] Although it is not determinative of the motion, the Court observes that the R&R correctly found that the contested provision in the Lloyds policy specifically voided coverage only if the insured submitted a false *claim* and did not include "false swearing" per se. However, case law suggests that fraud as an affirmative defense under New York insurance law includes false swearing on a material issue. See, e.g., Varda, 45 F.3d at 639. Further, false swearing can also constitute a breach of a policy's cooperation clause more generally. See, e.g., 525 Fulton St. Holding Co. v. Mission Nat'l Ins. Co., 610 F.Supp. 72, 73-74 (S.D.N.Y. 1985); Lenhard v. Genesee Patrons Co-op. Ins. Co., 31 A.D.3d 831, 833, 818 N.Y.S.2d 644, 2006 N.Y. Slip Op. 05259 (3d Dep't 2006). In any event, Judge Azrack has correctly concluded that, regardless of what provision or whether Lloyds must prove that Eurospark made a false claim in order to disclaim coverage or can also do so by proving that Eurospark falsely swore on a material issue, Lloyds has failed to carry its burden of showing that Spiegel intentionally lied as a matter of law and, thus, its motion resting on fraud must be denied.

instances "where credibility is properly determined as a matter of law[.]" Rickert v. Travelers Ins. Co., 159 A.D.2d 758, 759, 551 N.Y.S.2d 985 (3d Dep't 1990). Lloyds relies on this line of cases. Yet, even in those cases in which New York courts have granted summary judgment based upon false statements made by an insured, documentary evidence conclusively established that the statements at issue were in fact fraudulent when made, see Carlin v. Crum & Forster Insurance Company, 191 A.D.2d 373, 595 N.Y.S.2d 420 (1st Dep't 1993), or the insured's repeated failures of recollection were wholly incredible on their face, Ricketts, 159 A.D.2d at 759-60, 551 N.Y.S.2d 985. Spiegel's statements, even if suspicious, do not fit that bill. Indeed, although Spiegel has not adequately explained why he did *affirmatively* state originally that the gold purchase money came from accounts receivable, it is also not at all clear why Spiegel would have intentionally lied or attempted to conceal the Mosexpo transaction from Lloyds during the EUO had he recalled it. There is no indication, for instance, that doing so would have bolstered or inflated Eurospark's claim, nor any evidence before the Court that Spiegel actually had something to hide in his dealings with Mosexpo.[8] Even more consequentially, contemporaneous documentation in the record does show that the gold purchase was made for Mosexpo and was to be paid via wire transfer from a party other than Eurospark. Drawing all inferences, as the Court must, favorable to Eurospark, there is a material fact in dispute regarding Lloyds' defense; a fact finder, with the opportunity to judge Spiegel's credibility in person, must determine whether his statements did result from confusion, misunderstanding, and/or failure to recall as opposed to simple intentional false swearing.

Accordingly, upon *de novo* review, the Court denies Lloyds' motion for summary

---

[8] Lloyds claims that both of Spiegel's explanations of the April 1997 transaction are "probably false in order to obscure major deficiencies in Eurospark's record keeping or to camouflage more nefarious dealing with Mosexpo." This is, at best, a theory of Lloyds' case to be presented to the jury. The use of the expression "probably false" is damning in and of itself.

13

judgment based upon its claim that Spiegel testified falsely as to a material issue with intent to defraud.[9]

## II. Lloyds' Motion Based Upon Eurospark's Alleged Breach of the "Books and Records" Clause

Another provision of the Lloyds policy requires that "[t]he Assured will maintain a detailed and itemized inventory of his or their property, including records of purchases and sales and separate listings of all travelers' stocks, in such manner that the exact amount of loss can be accurately determined therefrom by the Underwriters." It is Lloyds' position that Eurospark breached this provision when it failed to record the Mosexpo order and the release of 3000 FTO of gold from the factory to Mosexpo.

Record-keeping provisions such as the one in the Lloyds policy should, according to New York law, be liberally construed "where there is evident merit in the claim, and the insured has made a *bona fide* effort to comply with the provisions of the policy in keeping honest books and accounts, however crude and unscientific they may be[.]" 6247 Atlas Corp. v. Marine Ins. Co., Ltd., 923 F. Supp. 523, 527 (S.D.N.Y. 1996) (quoting Garten v. Gen. Accident Fire & Life Assur. Corp., 206 A.D. 154, 157, 200 N.Y.S. 546 (4th Dep't 1923). Such provisions "will be given such reasonable interpretation as will protect the insurer against fraudulent and excessive claims." Garten, 206 A.D. at 157, 200 N.Y.S. 546. Whether an insured has substantially complied with the books and records provision of an insurance policy is normally a question of

---

[9] The parties also dispute whether any misrepresentations about the Mosexpo transaction were material to Lloyds' investigation as it was then proceeding. See Fine v. Bellefonte Underwriters Ins. Co., 725 F.2d 179, 183 (2d Cir. 1984) ("The materiality requirement is satisfied if the false statement concerns a subject relevant and germane to the insurer's investigation as it was then proceeding."). Like credibility, whether a misrepresentation is sufficiently material to void the policy is generally a question of fact for a jury to determine. See Lenhard, 31 A.D.3d at 833, 818 N.Y.S.2d 644, 2006 N.Y. Slip Op. 05259. Even if the Court were to assume *arguendo* that Spiegel's misrepresentations were material, however, Lloyds' motion must still be denied because issues of fact as to his credibility remain.

fact for the jury. Accord <u>A.B.N. Jewelry, Inc. v. Am. Alliance Ins. Co.</u>, 242 A.D.2d 457, 662 N.Y.S.2d 254 (1st Dep't 1997). Applying this "substantial compliance" rule, the R&R finds that a jury could conclude that the omission of portions of the April 1997 transaction from Eurospark's books and records was immaterial to the claim for stolen gold and could be explained through Spiegel's testimony.

Lloyds' objection advances the argument that Eurospark's failure to record the 1997 transaction constituted a failure by Eurospark to make a *bona fide* effort to comply with the record-keeping provisions of the policy. Lloyds contends, specifically, that to determine the exact amount of loss under a valid roll-forward calculation, all "gold in" and "gold out" transactions between January 1, 1997 and March 14, 1998 would have to have been accurately recorded – yet, based on Spiegel's own testimony, there was no record of the Mosexpo "gold out" transaction of 3000 FTO. It is the position of Lloyds' expert accountant, Warren Johnson, that this alleged movement of 3000 FTO of gold with no record makes it impossible to accurately determine the amount of gold at the factory as of the date of the robbery. Lloyds further objects to the R&R insofar as it found: that fraud is an element of the "books and records" defense; that any gap in the books and records as to the 1997 transaction can be cured by Spiegel's recollection; and that an affidavit submitted by Eurospark's expert, Bourget, created an issue of fact.

Drawing all inferences in favor of Eurospark, the Court holds that Lloyds has not satisfied its burden of showing that Eurospark breached the "books and records" clause as a matter of law. First, this case is largely distinguishable from those where insureds were generally unable to produce any meaningful records to support their claims and, consequently, where insurers were forced to rely almost solely on self-serving statements of the insureds in

order to determine the amount of loss. See, e.g., Globe Jewelry, Inc. v. Pennsylvania Ins. Co., 72 Misc. 2d 563, 564, 340 N.Y.S.2d 295 (1st Dep't 1973); Harris v. Gen. Accident, Fire and Life Assur. Corp., 187 N.Y.S. 291, 293 (1st Dep't 1921); Garten, 206 A.D. at 157, 200 N.Y.S. 546. Here, by contrast, not only did Eurospark maintain a number of detailed records that were relied upon in the roll-forward calculation,[10] but the relevance and extent of the omission of the Mosexpo transaction from those records is very much in dispute. Eurospark has offered admissible proof through its expert, Bourget, that the absence of these records (a) is attributable entirely to the fact that Mosexpo, not Eurospark, paid Fleet directly for the gold, and, far more importantly, (b) that there are records that do reflect that the gold was for Mosexpo, that payment was to be made by a third party, and that the transaction reduced the consignment balance by 3000 FTO. Eurospark does, however, acknowledge a missing piece – a record of Mosexpo's removal of the 3000 FTO of gold from Eurospark's factory. But, the Court is very mindful that this "gap" did not inflate the size of Eurospark's claim. Thus, viewing this record as a whole and under any liberal construction of the "books and records" obligation, the issue of whether Eurospark "substantially complied" with its obligations here is clearly a matter for the jury and not for the Court to determine as a matter of law.

Lloyds' remaining general objections to the R&R are without merit. First, the R&R does not state that fraud is an element of the "books and records" defense, but simply rejects Lloyds' claim that the omission *was* fraudulent or constituted a failure to make a *bona fide* effort as a matter of law. Proof of fraud on this defense is not Lloyds' burden; Lloyds, of course, is still entitled to offer proof of fraud on the part of Eurospark, for indications of fraud will necessarily

---

[10] Those records, according to Eurospark's expert, included Eurospark's general ledger, purchase journals, sales ledgers, monthly gold consignment account statements, consignment transactions documents, account payable files, vendor/contractor files, customer files and source documents for shipments and receipts.

be relevant in construing such provisions to protect against false and excessive claims. See, e.g., 6247 Atlas Corp., 923 F.Supp. at 527; Licht v. New York Indem. Co., 250 N.Y. 211, 214, 164 N.E. 910 (1928). Second, the R&R does not hold that Spiegel's recollection can cure any gap in Eurospark's records. Rather, the R&R correctly notes that the law allows for "explanation and even supplement by oral statement" where there have been reasonable attempts at compliance, Licht, 250 N.Y. at 214, 164 N.E. 910, which, in any event, is a jury question. Finally, the Court disagrees with Lloyds' characterization of the Bourget affidavit as nothing more than a "smokescreen" that cannot create an issue of fact. Quite the opposite. The affidavits of the experts for both sides establish manifestly that there is a material dispute as to whether there was substantial compliance with the record-keeping terms of the policy, *i.e.*, that Lloyds did or did not have sufficient records to accurately determine the exact amount of the loss.

Accordingly, the Court agrees with Judge Arrack's recommendation, and, upon *de novo* review, denies Lloyds' motion for summary judgment based upon the alleged breach by Eurospark of the books and records clause of its policy.

### III.    Lloyds' Motion To Strike Eurospark's Claim for Labor

The final branch of Lloyds' motion challenges Eurospark's claim for nearly $1 million in the value of labor allegedly lost in stolen gold that was either finished jewelry or work-in-process. A clear cut defense, Lloyds contends that the value added of labor was just not covered under the policy it issued.

Two provisions of the policy are relevant here. The first is General Conditions 9(A), which provides:

> The Underwriters shall not be liable beyond the actual cash value of the property at the time of any loss or damage and the loss or damage shall be ascertained or estimated according to such actual cash value with proper deduction for depreciation, however caused, and shall in no event exceed the lowest figure put upon such property in the

17

> Assured's inventories, stock books, stock papers or lists existing at the time the loss or damage occurred, nor the cost to repair or replace the same with material of like kind and quality. Any antiquarian or historical value attaching to the said property shall be excluded from the estimate of loss or damage.

The other is the "Loss Settlement Clause", which provides:

> Notwithstanding anything contained in General Conditions 9(A) of the Certificate to the contrary, it is understood and agreed that losses, if any of the Assured's own stock will be adjusted on the basis of the London Bullion Brokers 2nd fixing price per ounce as of the date of loss or if the date of loss is not a business day then the first business day after the loss.

Lloyds argues that the term "stock" in the Loss Settlement Clause includes all gold in Eurospark's possession – raw, work-in-process, and finished goods (chains and jewelry), and that all are valued on the basis of the 2nd London Fix price. As a result, Lloyds contends that the value of any labor that Eurospark added to gold in the manufacturing process was not covered. Eurospark objects on the ground that that the term "stock" is ambiguous and undefined in the policy and that New York law requires any such ambiguity be construed against the insurer. Eurospark counters, moreover, that the term "stock" in the Loss Settlement Clause should be read as referring only to raw gold; the proper valuation for finished or semi-finished stock, it argues, is "Actual Cash Value" (which would include coverage for value added as a result of labor).

Eurospark correctly articulates the chore before the Court. "The starting point in interpreting an insurance policy is to determine whether the policy terms are ambiguous." Hartford Fire Ins. v. Mitlof, 208 F.Supp.2d 407, 412 (S.D.N.Y. 2002) (internal citations and quotation marks omitted). Ambiguities in an insurance policy certainly are to be construed against the insurer, particularly when the language at issue is in an exclusionary clause or purports to limit the insurer's liability. See Breed v. Ins. Co. of North America, 46 N.Y.2d 351, 353, 413 N.Y.S.2d 352 (1978). Indeed, the insurer "must establish that the words and

18

expressions used (in the insurance policy) not only are susceptible of the construction sought by (the insurer) but that it is the only construction which may fairly be placed on them. . . . The insurer is obliged to show (1) that it would be unreasonable for the average man reading the policy to (construe it as the insured does) and (2) that its own construction was the only one that fairly could be placed on the policy." Am. Nat'l Fire Ins. Co. v. Mirasco, Inc., 249 F.Supp.2d 303, 319 (S.D.N.Y. 2003) (internal citations and quotation marks omitted).

Though the Court agrees with Eurospark's statement of the question, it agrees with Lloyds' answer to it. The term "stock" as used in the policy is unambiguous and clearly includes gold possessed by Eurospark in all of its forms. Numerous provisions in the policy belie Eurospark's contention that the term "stock" refers only to the raw gold. Section 1 of the insurance certificate identified covered property as follows: "A) Stock (including other people's goods); B) Money in Locked Safe at the Assured's premises; C) Patterns, Moulds and Dies at the Assured's premises; D) Furniture, Fixtures, Machinery, Tools and Fittings at the Assured's premises; E) Assured's interest (as tenant under a lease or other rental agreement) in Improvements and Betterments to premises."[11] There is no doubt that the stolen items here were all clearly part of "A) Stock . . . ." Indeed, the term "Stock" under A) is more specifically described in the certificate to include: "Pearls, precious and semi-precious stones, jewels, jewelry, watches and watch movements, gold, silver, platinum, other precious metals, and alloys and other stock usual to the conduct of the Assured's business[.]" Furthermore, in the Jewellers Block Policy Proposal Form Eurospark sent to Lloyds, it noted under the heading "Nature of Stock As Per Last Stock Inventory" that 100% of his stock constituted "gold, gold bullion, chains, gold wire." Based on all of these provisions, it is clear that raw gold, work-in-process,

---

[11] Eurospark did not purchase insurance coverage for either D) or E).

and finished products are all subsumed within the term "stock". Given the plain language of the policy, it is unnecessary to consider Eurospark's offering that there is an "industry-specific" meaning of "stock" which is separate from "semi-finished stock" or "finished stock", as there is no ambiguous term to construe.[12]

Additionally, the Court is fully in accord with Judge Azrack's determination that the Loss Settlement Clause of the policy issued by Lloyds provides the exclusive method for adjusting the loss of Eurospark's "stock" and that it does not include any provision for the value of labor. In clear words with powerful meaning, the clause unambiguously states that, notwithstanding anything to the contrary in the general provision limiting the insurer's liability to actual cash value, losses of the "Assured's own stock" are be adjusted on the basis of the 2nd London Fix. "Notwithstanding" means exactly that. See Premier Car Rental, Inc. v. Gov't Emps. Ins. Co., 223 A.D.2d 629, 631, 637 N.Y.S.2d 177, 178-79 (2d Dep't 1996) (noting that "notwithstanding" means "without prevention or obstruction from or by; in spite of") (citing Webster's Third New International Dictionary 1545 (3d ed. 1961)). As a result, although the loss of other "non-stock" property insured under the policy may be determined by actual cash value in line with General Conditions 9(A),[13] the Loss Settlement Clause provides the exclusive method for adjusting any

---

[12] Surely, the fact that the Mass. Bay policy contains the term "finished stock" is irrelevant to the use of the term "stock" in the Lloyds policy. Regardless, even if the term "finished stock" may also be used within the industry, the more generic term "stock" in the Lloyds policy clearly incorporates all types of gold in whatever state (raw, semi-finished, or finished) and regardless whatever other expressions may also be appropriately used in the industry to describe various sub-categories of "stock".

[13] Other property insured which would presumably be valued at "Actual Cash Value" includes money in the locked safe, patterns, moulds and dies, and anything that is not the Assured's "own stock." The reference to the Assured's "own" stock in the Loss Settlement Clause presumably refers to the fact that the property insured may also include property entrusted to Eurospark by others under specified conditions in the policy. Any difference between Eurospark's "own stock" and stock entrusted to it, however, is not before the Court on this motion.

loss of Eurospark's gold in any and all of its forms. With all of its precision, this clause does not mention much less provide additional loss coverage for labor or other value that Eurospark may have added to the gold.

Finally, even assuming *arguendo* that there was ambiguity in the Loss Settlement Clause, Eurospark has submitted no evidence that would create a material issue about whether this clause was in any way intended to incorporate the value of labor added to the gold. Indeed, in deposition testimony cited by Eurospark here, the Lloyds' underwriter for the policy specifically stated that the Loss Settlement Clause valued the property only according to the weight of the gold multiplied by the 2nd London Fix price. (See Deposition of Simon Wilmot Smith, dated June 26, 2002, at 174-176). Further, the underwriter noted that in some cases, for instance involving the setting of diamonds into certain high-end gold jewelry, labor costs might be specifically insured, and, ordinarily, in a loss settlement clause that would have been written differently to include a pre-agreed percentage for labor accompanied by an upwardly adjusted premium. (Id. at 193-94). With respect to practices relating to insuring against jewelry industry losses, Eurospark offers no evidence to the contrary. In fact, the only insurance industry argument Eurospark makes is its cite to a statement Eurospark made relating to the "Bookkeeping" section of the policy proposal regarding Eurospark's records. Eurospark informed Lloyds that its records were "based on purchase and sale of gold and inventory by weight plus labor." This statement about Eurospark's records, of course, does not demonstrate even an intent or request on the part of Eurospark that labor was to be insured – let alone show the intent and understanding of both parties that it was. Simply put, Eurospark has failed to show that there is any ambiguity whatsoever in the valuation method explicitly set forth in the Loss Settlement Clause either by the words of the clause or any evidence extrinsic to it.

21

Accordingly, it is clear to the Court that Lloyds has carried its burden of showing that there is no material issue in dispute with respect to the construction of the policy. It would be unreasonable to construe the provision as Eurospark does, and the construction advanced by Lloyds is the only one that can fairly be placed upon the policy. See Am. Nat'l Fire, 249 F.Supp.2d at 319. For all of these reasons and those stated by Judge Azrack in her R&R, the Court grants upon *de novo* review partial summary judgment to Lloyds dismissing Eurospark's claim for the loss of the value added to raw gold by its labor as represented in the actual value of finished and work-in-process goods.[14]

## IV.    Mass. Bay's Motion Based Upon Lost Business Income Coverage

The Mass. Bay policy insures for the loss of business income sustained by Eurospark "due to the necessary suspension of [its] 'operations' during the 'period of restoration'" following an otherwise covered loss. The period of restoration was to begin, according to the policy, with the date of the physical loss and to end on the date "when the property at the described premises should be repaired, rebuilt, or replaced with reasonable speed and similar quality." The policy specifically excluded, however, coverage for losses resulting from damage or destruction of "finished stock" or the time required to reproduce "finished stock" – defined under the policy as "stock you have manufactured." Mass. Bay moved for summary judgment on the ground that the policy did not cover loss or theft of stock, nor the time required to reproduce "finished stock". Mass. Bay also grounded its disclaimer on the argument that the period of restoration covered by the policy was the period of time required by Eurospark to obtain gold on the open market and that that period here would be one day (resulting in no loss of business income). Finally, Mass. Bay argued that, even assuming that there was coverage as

---

[14] The Court need not address, therefore, Lloyds' contention that Eurospark's records do not provide a sufficient basis to calculate the value of the labor.

claimed by Eurospark, Eurospark could not calculate how much of its gold was work-in-process or finished product and, consequently, could not prove its claim.

Judge Azrack held that Mass. Bay failed in its burden on the motion. Contrary to the insurer's contention, "stock", she found, was not excluded from the policy for coverage of business income lost and extra expense incurred. Judge Azrack, however, did concur with Mass. Bay that "finished stock" was excluded and that raw gold would also be excluded practically because the "period of restoration" for raw gold is nil. Judge Azrack even accepted the notion that many of Eurospark's records might be too vague to allow a fact finder to distinguish work-in-process from raw gold or finished product. Nonetheless, drawing all inferences in a manner favorable to Eurospark, she concluded that the robbery of the Eurospark gold did have *some* negative impact on its business such that there was a "period of restoration" . Further, she observed that there was at least a material issue as to whether Eurospark suffered an "extra expense" – interest Eurospark paid on a loan given by Fleet Bank immediately after the robbery, which, apparently, was made necessary by the robbery. Given all of that, Judge Azrack recommended that this Court deny Mass. Bay's motion for summary judgment. The Court has thoroughly reviewed not only the R&R as to Mass. Bay's motion, to which no party has objected, but the record as well. None of the recommendations regarding the Mass. Bay motion are clearly erroneous, and thus they are adopted in full.

### Conclusion

Upon *de novo* review of the entire record, the Court finds the report and recommendation filed by Magistrate Judge Azrack is comprehensive and exhaustive on the law, which it has clearly and correctly applied to the admissible evidence submitted by the parties. The report and recommendation, therefore, is adopted in full without modification.

Consequently, Lloyds' motion for summary judgment is granted solely with respect to that portion denying coverage for labor but is otherwise denied. As to that claim against Lloyds for the value of labor, Eurospark's complaint is dismissed. Mass. Bay's motion for summary judgment is denied in its entirety.

The parties are directed to contact Magistrate Judge Azrack to arrange for a pretrial conference at which time an order will be entered directing the prompt filing of a final joint pretrial order.

SO ORDERED.

Dated: Brooklyn, New York
July 2, 2008

s/ENV

ERIC N. VITALIANO
United States District Judge